**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **MARIA LAMONT** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 4:17-cv-3219** |
| | § | |
| | § | **JURY DEMANDED** |
| | § | |
| | § | |
| **STATOIL GULF SERVICES, LLC,** | § | |
| | § | |
| | § | |
| *Defendant.* | § | |

---

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

---

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

    **NOW COMES,** Plaintiff Maria LaMont and files this Plaintiff's Original Complaint and Jury Demand complaining of and about Defendant Statoil Gulf Services, LLC, showing to the Court as follows:

### I.
#### PARTIES

1.    Plaintiff, Maria LaMont, is an individual citizen residing in the State of Texas.

2.    Defendant, Statoil Gulf Services, LLC, is foreign limited liability corporation conducting business in the State of Texas.

3.    Defendant is a publicly traded company, which files Form 10-K reports with the Securities and Exchange Commission pursuant to Section 15(d) of the Securities Exchange Act of 1934, and thus is a company covered under Section 806 of the Sarbanes-Oxley Act of 2002.

4.     At all times relevant hereto, Defendant employed managers, supervisors, agents, and employees who Plaintiff alleges had the authority to make decisions concerning Plaintiff's employment. In making said decisions, these individuals engaged in the pattern and practice of discriminatory and illegal treatment which forms the basis of Plaintiff's allegations in the instant Complaint.

5.     Defendant may be served with process through its registered agent, Corporation Service Company d/b/a Lawyers Incorporating Service Company, as reflected in the Texas Secretary of State records, at 211 E. 7th Street, Suite 620 Austin, TX 78701-3218. Plaintiff has requested a waiver of summons from Defendant at this time.

## II.
### NATURE OF THE ACTION

6.     This is an action against Defendant for violations of Sarbanes-Oxley ("SOX"), 18 U.S.C. § 1514A (2002). Specifically, Plaintiff contends that she was retaliated against when on September 29, 2016, Defendant terminated Plaintiff's employment after Plaintiff engaged in SOX protected activities.

## III.
### JURISDICTION AND VENUE

7.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 as this case presents a federal question pursuant to SOX, 18 U.S.C. § 1514A (2002).

8.     Moreover, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this federal district.

9.     Plaintiff also brings this claim pursuant to 18 U.S.C. § 1514A(b)(1)(B) in that the Secretary of Labor did not issue a final decision within 180 days of filing Plaintiff's complaint

with the Secretary, and that delay was not due to bad faith of the Plaintiff.

## IV.
### EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.     Plaintiff has exhausted her administrative remedies under SOX.

11.     Specifically, on January 20, 2017, Plaintiff filed a complaint of retaliation pursuant to SOX with the U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA"), Region VI Office  (Complaint No. 6-3285-17-053) against Defendant.

12.     Over one hundred eighty (180) days have passed since Plaintiff filed her complaint with OSHA.

13.     As such, Plaintiff is exercising her right to proceed with this matter in federal court.

## V.
### FACTUAL BACKGROUND

14.     Ms. LaMont was an employee of Statoil from May 26, 2015, to September 29, 2016, when her employment was terminated.

15.     Ms. LaMont held the position of Joint Venture (hereinafter "JV") Accountant during her employment with Statoil and supervised six contractors.

16.     Ms. LaMont's direct supervisors included Eleanor Wong (JV Leader) (hereinafter "Ms. Wong") and Steven Nguyen (JV Leader) (hereinafter "Mr. Nguyen").

17.     In June 2015, Ms. LaMont attended a departmental training in Statoil's auditorium with fifty to seventy-five employees. During this training, Sandra Santoro (Drilling and Production USA Manager) and KPMG Partner (auditors) (hereinafter "Ms. Santoro") presented and discussed Statoil's Working Interest Report (hereinafter "WI Report") with the employees in attendance. The WI report is designed to internally report Statoil's and partners' oil revenue and expense ownership percentages, which in turn are used to create financial statements for shareholders and prospective investors of Statoil.

18.     During this presentation, Ms. LaMont expressed to Ms. Santoro her concern that the validity dates for the revenue, joint venture, and land working interest decks (i.e., groups of ownership) were missing from the WI report. Ms. LaMont raised this concern because the information as presented did not confirm that Statoil's revenue and expenses were in alignment with legal records and, therefore, the financial statements to shareholders and prospective investors were also not in alignment.

19.     The next day, Judy Moon (then JV Leader) (hereinafter "Ms. Moon") and Tom Silva (GBS Leader) (hereinafter "Mr. Silva") met with Ms. LaMont individually and told her that management had to do damage control with the auditors. Ms. Moon and Mr. Silva then instructed Ms. LaMont not to ask any more questions about the WI report. Mr. Silva told Ms. LaMont, "The auditors ask us questions. We don't ask the auditors questions. I'm not telling you to lie to the auditors."

20.     On or about October 23, 2015, Ms. Wong met with Ms. LaMont and told her that she was "harsh" with some of the Statoil contractors Ms. LaMont supervised. When Ms. LaMont asked Ms. Wong for examples of her alleged harsh behavior, Ms. Wong told Ms. LaMont that she had not received this information from the contractors, but that she had heard it from "someone else."

21.     After this meeting, Ms. LaMont contacted Trond Dybevaag (Finance & Control Manager and Ms. Wong's and Mr. Nguyen's supervisor) (hereinafter "Mr. Dybevaag") to request permission to survey the contractors, to which Mr. Dybevaag agreed.

22.     On November 6, 2015, Ms. LaMont sent a questionnaire to her team requesting anonymous feedback about her alignment with Statoil's values, including: caring, hands on, open, and courageous.

23.     On the morning of November 12, 2015, Mr. Dybevaag met with Ms. LaMont to inform her that four of her six contractors anonymously participated in her survey and that the feedback was remarkable. Ms. LaMont asked Mr. Dybevaag about the possibility of being promoted to Senior, to

which Mr. Dubevaag responded that the promotion depended on a number of factors after a nomination process. Mr. Dybevaag said, "if it does not happen this time around, you are definitely close."

24.     On the afternoon of November 12, 2015, Mr. Nguyen met with Ms. LaMont and discussed her preliminary 2015 performance review (different than the survey Ms. LaMont sent to her six contractors). Mr. Nguyen told Ms. LaMont that he was going to push for a 4 in deliveries and a 3 for behavior in her 2015 performance review at the interdepartmental calibration meeting. The lowest ranking an employee can get in their performance review is a 1 and the highest is a 5. Generally, a 3 means that an employee is doing well at Statoil and gets a full bonus. It is rare for Statoil to give a 4 or a 5.

25.     On December 1, 2015, Ms. LaMont attended a multi-departmental training in Statoil's auditorium in which Statoil's in-house attorney, Thomas Gottsegen, (hereinafter "Mr. Gottsegen") gave a presentation about protecting Statoil from legal issues. There were about one hundred employees in attendance at this presentation. During the open question forum, Ms. LaMont asked a question to Mr. Gottsegen about revenue netting. In particular, Ms. LaMont asked, "My understanding is that we as a company are revenue netting both working interest owners and royalty owners. Can you talk about the benefits and risks that were considered when making this decision?"

26.     Ms. LaMont asked this question because she was aware that Statoil was revenue netting both working interest owners and royalty owners, when it is illegal to revenue net royalty owners. Generally, revenue netting is when you take the expenses for the month out of the owner's revenue check and then send the owner the remaining amount. While this may be allowed towards working interest owners, depending on the particular joint operating agreement in place, revenue netting is prohibited towards royalty owners because by definition a royalty interest does not bear any costs of operations needed to produce a well and Statoil is not permitted to take control of the royalty owner's

cash flows across multiple wells. Instead, Statoil is required to send royalty owner both an expense invoice and a revenue check for the separate wells as necessary.

27.     Mr. Gottsegen responded to Ms. LaMont that he did not have the information to answer her question, but that Mary Lou Fry (Legal Manager at Statoil) (hereinafter "Ms. Fry") would be better suited to answer her question. Meanwhile, Ms. Santoro took the microphone and from across the room exclaimed, "I can answer that question. We are doing nothing wrong."

28.     On December 2, 2015, Ms. Wong met with Ms. LaMont and told her that she had "bad behavior" and that she should not challenge corporate decisions (referring to Ms. LaMont's question on revenue netting). Ms. LaMont explained how she had asked a legitimate question and that she wanted to understand how she was doing something wrong. This incident was documented in Ms. LaMont's 2015 performance review as an example of "bad behavior."

29.     On December 22, 2015, Ms. LaMont was updating working interest owners in Statoil's financial system as part of her job responsibilities. In doing this, Ms. LaMont came across a partner by the name of "LIPPERT 1H," which was the name of an oil well. This partner also did not have a tax id number, physical address, or mailing address and had been approved by Ms. Wong a while back to be created in the system. After Ms. LaMont began looking at the accounts receivables, she noticed that this partner had an outstanding balance of $5 million dollars. This amount had been unpaid for almost a year and was never going to be paid because this partner did not exist. Yet, these $5 million were listed as an asset in the financial statements, suggesting to shareholders that Statoil had $5 million dollars coming in the future, when it did not.

30.     As a result, Ms. LaMont emailed Ms. Wong and Candace Corbin (JV Coordinator) (hereinafter "Ms. Corbin") and notified them that there was a fake partner passing as a working interest owner, which was billed for $5 million dollars. Ms. Wong replied to Ms. LaMont suggesting to seek guidance from the Land Department. Ms. LaMont communicated to Ms. Wong that if Statoil

did not know who the partner was, that Statoil was obligated to take on the debt, as opposed to creating a fake partner. Ms. LaMont made it clear to Ms. Wong that according to fundamental principles of accounting, Statoil could not record an asset in the financial statement that did not exist because this would provide false information to shareholders and users of the financial statements. Ultimately, Ms. LaMont processed an accounting entry to reclassify the $5 million as an expense for Statoil, thus correcting the financial statements.

31.     On January 12, 2016, Ms. LaMont and half of the Joint Venture Accounting team met with Mr. Dybevaag to share their concerns about their fear of retaliation from Ms. Wong and Mr. Nguyen if they were to be confirmed as JV leaders (at this time, Ms. Wong and Mr. Nguyen were interim JV leaders). The meeting was organized by Lavina Brown because several of Ms. LaMont's team members had had negative experiences working with Ms. Wong and Mr. Nguyen, including noticeable negative treatment compared to other people on the JV team. Mr. Dybevaag told Ms. LaMont and her team that he would address their concerns with Ms. Wong and Mr. Nguyen.

32.     On January 20, 2016, Ms. Wong and Mr. Nguyen met with Ms. LaMont to share that she would be receiving a 3 for performance and a 2 for behavior in her 2015 performance review. Ms. Wong and Mr. Nguyen told Ms. LaMont that these "lower ratings were due to a bad economy." Ms. LaMont asked whether this reason (i.e., the bad economy) would be noted in her performance review, to which Ms. Wong and Mr. Nguyen stated that it would.

33.     On January 23, 2016, the 2015 performance review comments became available online. Ms. Wong met with Ms. LaMont and stated, "Maria, I know you can be upset about your ratings. We will talk next week. We will talk."

34.     On January 27, 2016, Ms. LaMont met with Ms. Kathryn Weber from Human Resources to request for her to be present during her 2015 performance review.

35.     On the morning of January 28, 2016, Ms. Weber met with Ms. LaMont to inform her that her request for Ms. Weber to be present during her 2015 performance review was declined because Mr.

Dybevaag requested for Ms. Wong "to handle the situation in a positive way with opportunity for alternative behavior."

36.     On the afternoon of January 28, 2016, Ms. Wong met with Ms. LaMont to discuss the comments in Ms. LaMont's 2015 performance review involving a 3 for deliveries and a 2 for behavior. While Ms. LaMont refuted her behavior rating, Ms. Wong refused to override the leaders' comments (i.e., Ms. Santoro's comment about Ms. LaMont regarding revenue netting on December 1, 2015).

37.     In early February 2016, Ms. Wong and Mr. Nguyen were promoted to department leaders.

38.     On February 4, 2016, Ms. Wong met with Ms. LaMont and informed her that she was being moved from the PPA team to the Eagle Fort/Marcellus desk (EF/MAR) in the near future. While Ms. LaMont's job title stated the same (JV Accountant), Ms. LaMont went from managing and supervising six contractors to being placed at an isolated desk with no one to supervise.

39.     On February 16, 2016, Ms. Wong notified Ms. LaMont that effective March 1, 2016, Ms. LaMont would be working at the EF/MAR desk.

40.     On February 17, 2016, Mr. Dybevaag met with Ms. LaMont and instructed her to stop sending follow-up emails to Ms. Wong summarizing her meetings with Ms. Wong. Ms. LaMont was writing follow-up emails to Ms. Wong in order to memorialize the topics during their meetings and summarize any tasks assigned to her by Ms. Wong.

41.     On February 17, 2016, an employee in Statoil's Finance Organization told Ms. LaMont that Mr. Nguyen had informed her that Ms. LaMont was moved from the PPA team to the EF/MAR desk because of Ms. LaMont's "behavior problems" (which there were really none).

42.     In March 2016, Statoil was involved in an ongoing multi-million-dollar lawsuit.

43.     On March 22, 2016, in response to a question raised by the land department, Ms. LaMont emailed Ms. Wong to reiterate her concern that using a fake partner to record an accounts receivable asset on the balance sheet related to ongoing litigation was misleading to the users of the financial

statements and was a misrepresentation of Statoil's financial position. It had turned out that the $5 million Ms. LaMont had found in December 2015 was part of a larger balance of $65 million spread across multiple wells that were in litigation. Ms. LaMont complained again about Statoil creating this fake partner because management had yet to correctly account for this $65 million contingency and because billing to a fake partner(s) meant that a fake asset balance was being reflected in the financial statements when in reality this balance was a litigation contingency and should have been accounted as such. Ms. LaMont complained that even if this fake asset balance did not result in a material financial misstatement, it could still be considered a control deficiency for purposes of SOX compliance.

44.      In June 2016, Ms. Wong met with Ms. LaMont to discuss Ms. LaMont's 2016 mid-year performance review. Ms. Wong discussed Ms. LaMont's deliveries and time management skills (giving one example of when Ms. LaMont had to miss a meeting to meet a specific deadline). Ms. Wong did not mention anything about Ms. LaMont's behavior during this meeting. She also did not give Ms. LaMont a rating for her performance or behavior.

45.      On August 22, 2016, Ms. LaMont emailed Mr. Nguyen (and copied Ms. Wong) to report that the financial information in the Partner's Statements of Account, published to hundreds of partners via Energy Link, were grossly inaccurate. For example, the amounts for cash calls paid, netted revenue, relevant invoice/date detail did not match to what Statoil was showing in its financial system in SAP. Furthermore, the statements contained invoice information for future transactions that had not been billed to partners yet, but that were already showing on these statements as balances due to be paid to Statoil by partners. The Partner's Statements of Account are different than the financial statements. The Partner's Statements of Account are monthly statements sent to partners reflecting the balance they owe to Statoil. Mr. Nguyen replied to Ms. LaMont that there would be a training held on August 25, 2016, to explain how to read the Partner's Statement of Accounts.

46.     On the morning of August 25, 2016, Ms. LaMont complained to Mr. Dybevaag that the Partner's Statements of Account reflected inaccurate information and that they were not being addressed by management. Mr. Dybevaag's response was, "I did not know any of this, but we will get answers in the training later today."

47.      The training was conducted on August 25, 2016, by the Capgemini team that worked on these projects with Mr. Nguyen's supervision.

48.     On August 25, 2016, after the training on the Partner's Statements of Account, Ms. LaMont emailed Ms. Wong and Mr. Nguyen to complain that the training on the Partner's Statements of Account had not addressed the reason why the Statements of Account showed inaccurate information.

49.     On August 26, 2016, Ms. Wong replied to Ms. LaMont stating that an external consulting team was investigating. However, to Ms. LaMont's knowledge, even during the end of September 2016, the statements still had not been corrected. When a partner would call to complain about the inaccuracies of the statements, Ms. Wong and Mr. Nguyen would instruct Ms. LaMont to tell the partners that the statements were a "work in progress" and that they were not finalized yet, which was not the case.

50.     In mid-September 2016, Ms. LaMont was pressured to process a refund of $2 million dollars to XTO (a company) without any supporting documentation that Statoil owed this amount. While the land department indicated to Ms. LaMont to process the refund on Wefler N U1H from its inception, documents showed that XTO had been out of the well in February 2015, thus reducing the refund to $500,000. Ms. LaMont complained to Statoil's legal department, controllers, and leaders, that there was no documentation to substantiate a $2 million refund, but she was still instructed to do so. Due to the lack of documentation, Ms. LaMont held off on processing the refund. Ultimately, the land

department wrote an addendum to the agreement with XTO defining that the refund should be from inception and processed the refund for $2 million to XTO.

51.     On September 20, 2016, Ms. LaMont emailed the land department and complained that a $1.5 million accounts receivable balance (money that is expected to be paid to Statoil) should be written off using the proper form as well as management approvals, instead of being accounted for by a "prior period adjustment" because this amount was never going to be paid and Statoil was overstating its financials. The $1.5M accounts receivable balance was related to four wells that Statoil drilled illegally and subsequently billed a partner for $1.5 million of the total drilling expenses. These billings were not in accordance with any contractual agreement in place. Because Statoil sold these wells in the first half of 2016 to a third party as part of a larger divestiture, writing off the $1.5 million accounts receivable balance could activate "subsequent event" treatment and/or disclosure requirements that could negatively impact the terms of the divestiture.

52.     Ms. LaMont met with Ms. Wong to request for the $1.5 million to be written off, but Ms. Wong refused. Instead, Ms. Wong instructed Ms. LaMont to do contact the land department and have them update the legal system of record in a way that would trigger a prior period adjustment, which said prior period adjustment would essentially allow Statoil to absorb the $1.5 million debt quietly without classifying it as a write-off and without escalating the transaction to management for approval. When Ms. LaMont refused to do this, Ms. Wong said, "this is how we are going to do it."

53.     On September 29, 2016, Ms. Weber and Mr. Dybevaag met with Ms. LaMont and terminated her employment effective immediately. Ms. LaMont was informed that her behavior was "bad" and that it was not "in alignment with Statoil company values."

## VI.
## CAUSE OF ACTION: RETALIATION PURSUANT TO SOX, 18 U.S.C. § 1514A (2002)

54.     Plaintiff incorporates by reference all of the foregoing allegations in each of the paragraphs above as if fully set forth herein.

55.     Defendant is an employer within the meaning of 18 U.S.C. § 1514(A)(a).

56.     Plaintiff engaged in a protected activity under SOX.

57.     Plaintiff provided information to a person with supervisory authority over her or a person who was otherwise authorized to investigate or discovery misconduct at Defendant's place of business, as specified by 18 U.S.C. § 1514A(a)(1).

58.     Plaintiff reasonably believed that the information she provided evidenced violations by Defendant of federal laws, rules, and regulations relating to securities and shareholder fraud.

59.     Defendant knew Plaintiff had engaged in a protected activity covered under SOX.

60.     In violation of SOX, 18 U.S.C. § 1514A, and in retaliation for reporting her reasonable belief of Defendant's violation of federal laws, rules, and regulations relating to securities and shareholder fraud, Defendant terminated Plaintiff's employment.

61.     Plaintiff's protected activity was a direct and contributing factor to Defendant's unfavorable actions against Plaintiff.

62.     Defendant had no legitimate business reason for its mistreatment of Plaintiff and the termination of her employment.

63.     Defendant's stated reasons for terminating Plaintiff are pretextual.

64.     As a direct result of the aforesaid unlawful retaliatory employment practices, Plaintiff has sustained and will in the future sustain permanent and irreparable economic and other harm, including, but not limited to, the loss of employment, damage to her reputation, loss of earnings, loss of benefits, loss of future earning power and potential, back pay, front pay, emotional

distress, attorney's fees, and interest.

## IX.
### JURY DEMAND

65.    Plaintiff demands a jury trial on all issues alleged in this matter. Plaintiff has submitted the appropriate jury fee with her Original Complaint.

## X.
### PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, the Court award a judgment against Defendant for the following:

      a.  Damages for past and future monetary losses as a result of Defendant's unlawful retaliation;

      b.  Damages for the loss of benefits, stock, and bonuses;

      c.  Compensatory damages;

      d.  Liquidated damages;

      e.  Emotional pain and suffering;

      f.  Attorney's fees;

      g.  Court costs and expenses;

      h.  Pre- and post-judgment interests;

      i.  Extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued under, pursuant to Rules 64 and 654 of the Federal Rules of Civil Procedure.

Respectfully submitted,



Alfonso Kennard, Jr.
Texas Bar No. 24036888
S.D. ID 713316
2603 Augusta Dr., Suite 1450
Houston, Texas 77057
T: (713) 742-0900
F: (713) 742-0951
alfonso.kennard@kennardlaw.com

**ATTORNEY-IN-CHARGE FOR PLAINTIFF**

**OF COUNSEL FOR PLAINTIFF:**



*/s/ José E. Galvan*
Jose E. Galvan
Texas Bar No. 24083039
S.D. ID 2200705
2603 Augusta Dr., Suite 1450
Houston, Texas 77057
T: (713) 742-0900
F: (713) 742-0951
jose.galvan@kennardlaw.com